UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEONG FRANCISCO PAULO,<br><br>                              *Plaintiff*,<br><br>v.<br><br>AGENCE FRANCE-PRESSE, GETTY IMAGES (US), INC., GETTY IMAGES, INC., JOHN DOES 1-100, and XYZ CORPORATIONS 1-100,<br><br>                              *Defendants*. | **COMPLAINT FOR COPYRIGHT INFRINGEMENT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Leong Francisco Paulo a/k/a "Francisco Leong" ("Francisco Leong" or "Leong or "Plaintiff"), by his undersigned attorneys, alleges as follows, upon actual knowledge with respect to himself and his own acts, and on information and belief as to all other matters.

**NOTICE OF RELATED CASE**

This case relates to *Leong Francisco Paulo v. Agence France-Presse*, et al., Case No. 1:21-cv-11209-GHW-SLC (S.D.N.Y.) (the "2021 Action").  Leong has filed this related action against Defendants to preserve claims of infringement of certain copyrighted works that registered after the 2021 Action was instituted.  Pursuant to 17 U.S.C. § 411, the owner of a "United States work" may not sue for copyright infringement before "registration… has been made[,]" *i.e.*, before the U.S. Copyright Office grants a copyright registration.  *See Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC,* 139 S. Ct. 881, 890 (2019).  Courts in this District have held that a plaintiff that files suit before a copyright registration is granted cannot "cure that defect" by amending its complaint.  *See Malibu Media, LLC v. Doe,* No. 18-CV-10956 (JMF), 2019 WL 1454317, at *1-3 (S.D.N.Y. Apr. 2, 2019).  This, in effect, may require a plaintiff to institute a separate civil action.

1

While this registration requirement of 17 U.S.C. § 411 does not apply to Leong's "foreign works," *see, e.g., Jose Armando Bermudez & Co. v. Bermudez Intern.*, No. 99 CV 9346, 2000 WL 1225792, at *10 (S.D.N.Y. Aug. 29, 2000), Leong files this second action to preserve his claims of infringement of copyrighted works that registered after the 2021 action was instituted (defined below as the "2022 Registered Works"), in case it is determined in the 2021 Action that some or all of these works are "United States works".  As such, this Complaint pleads various allegations— the vast majority of which are identical to those pleaded in the 2021 Action (*see* Exhibit A)— solely to support claims of infringement of the 2022 Registered Works.

## NATURE OF THE ACTION

1.      This is a civil action for copyright infringement in violation of the Copyright Act, 17 U.S.C. § 501 *et seq*.  Francisco Leong brings this action against all Defendants for intentional and willful copyright infringement of thousands of Leong's journalistic photographs within the U.S.

2.      After nearly 14 years of dutiful service to Defendant Agence France-Presse ("AFP"), AFP abruptly terminated Leong's employment and falsified performance issues to justify its actions, only to later be reprimanded by a Portuguese labor court for doing so.  Yet even that stern warning from a Portuguese tribunal did not stop AFP from continuing its arrogant mistreatment of Leong, or from engaging—together with business partners Getty Images (US), Inc. and Getty Images, Inc. (together, the "Getty Defendants")—in massive and systematic copyright infringement of Leong's photographs as well as violations of copyright management information ("CMI") throughout the U.S.

3.      In particular, AFP and the Getty Defendants intentionally and willfully infringed Francisco Leong's copyrights in his photographs through the reproduction, public display,

distribution, creation of derivative works, and holding out of Leong's photographs for license long *after* Leong had terminated AFP's license to do so, and affixed and distributed false and/or altered CMI to these photographs in an effort to cover their tracks, all of which has caused widespread downstream infringement and unauthorized use of Leong's photographs in news articles, on websites, and even on wall posters, mugs, and jigsaw puzzles.

4.      AFP and the Getty Defendants' actions have also paved the way for a slew of infringers that are making unauthorized use of Leong's photographs, namely, Media Storehouse, Ltd. and various media outlets, including Bloomberg L.P., Bloomberg Finance L.P., The Bureau of National Affairs, Inc., NYP Holdings, Inc., Heavy, Inc., Forbes Media LLC, Breitbart News Network, LLC, The New York Times Company, The Athletic Media Company, The Arena Group Holdings, Inc., BuzzFeed, Inc., and Dotdash Meredith, Inc.

5.      Leong seeks to enjoin the above activities, and recover actual damages, Defendants' profits, and other relief as the Court may deem appropriate.

## THE PARTIES

6.      Plaintiff Leong Francisco Paulo a/k/a "Francisco Leong" ("Plaintiff") is a Portuguese citizen and resident of Lisbon, Portugal.  Plaintiff is an accomplished and skilled Portuguese photojournalist with over 20 years of experience covering global news, from political summits to major sporting events to armed conflicts that placed him in harm's way.

7.      Defendant Agence France-Presse ("AFP") is a French state-owned corporation, with its main North America location at 1500 K Street NW #600, Washington, DC 20005, and an office in this District at 155 E. 44th Street, Floor 23, New York, New York 10017.  AFP is a news agency that produces and publishes news articles, photographs, videos, and graphics to a worldwide audience created and authored by its stringers and staff journalists.

8.      Defendants Getty Images, Inc. and Getty Images (US), Inc. (individually and collectively referred to as the "Getty Defendants") are Delaware corporations, each having their principal places of business at 605 Fifth Ave South, Suite 400, Seattle, Washington 98104. Getty Images (US), Inc. has an office in this District at 195 Broadway, Floor 10, New York, New York 10027.  Getty Defendants are the corporate entities associated with Getty Images, one of the largest visual media companies and content licensing agencies in the world.

9.      Non-party Media Storehouse, Ltd. is a United Kingdom entity with a registered business address at The Wenta Business Centre, Colne Way, Watford, WD24 7ND, UK.  Non-party Media Storehouse has partnered with Defendant AFP to deliver wall art and prints to consumers located within the U.S.

10.      Non-party Bloomberg L.P. is a Delaware limited partnership with a principal place of business at 731 Lexington Avenue New York, NY 10022.  Non-party Bloomberg L.P. is a publishing and news media corporation.  Non-party Bloomberg Finance L.P. is a Delaware limited partnership with a principal place of business at 731 Lexington Ave, New York, NY 10022.  Non-parties Bloomberg L.P. and Bloomberg Finance L.P. operate Bloomberg News and the website available at https://www.bloomberg.com and are referred to individually and collectively as "Bloomberg News."

11.      Non-party The Bureau of National Affairs, Inc. ("BNA") is a Delaware entity with a principal place of business at 1801 S Bell St, Arlington, Virginia 22202.  Non-party BNA is a leading publisher of print and electronic information and operates the Bloomberg Law website available at http://www.bloomberglaw.com.

12.     Non-party NYP Holdings, Inc. is a Delaware entity with a principal place of business at 1211 Avenue of the Americas New York, New York 10036.  Non-party NYP Holdings, Inc. owns and manages the conservative daily tabloid The New York Post.

13.     Non-party Heavy, Inc. is a California entity with a principal place of business at 330 West 38th Street, #1002, New York, NY 10018.  Non-party Heavy, Inc. is the owner of the Heavy.com aggregation platform accessible at heavy.com.

14.     Non-party Forbes Media LLC is a Delaware limited liability company with a principal place of business at 499 Washington Boulevard, Jersey City, NJ 07310.  Non-party Forbes Media LLC is a publishing and news media corporation.

15.     Non-party Breitbart News Network, LLC is a Delaware limited liability company with a principal place of business at 11999 San Vicente Blvd, Los Angeles, CA 90049.  Non-party Breitbart News Network, LLC is a publishing and news media corporation.

16.     Non-party The New York Times Company ("the New York Times") is a New York corporation with a principal place of business at 620 Eighth Avenue, New York, NY 10018.  Non-party The New York Times Company is a mass media company that publishes The New York Times newspaper and operates the website available at http://www.nytimes.com.

17.     Non-party The Athletic Media Company is a Delaware corporation with a principal place of business at 525 Market Street, Suite 3000, San Francisco, California 94105.  Non-party The Athletic Media Company operates *The Athletic*, a sports coverage website available at https://theathletic.com and is owned by The New York Times Company.

18.     Non-party Dotdash Meredith, Inc. ("Dotdash Meredith") is a Delaware corporation with a principal place of business at 225 Liberty Street 4th Floor, New York, NY

10281.  Non-party Dotdash Meredith is the largest digital and print publisher in America and operates People Magazine and the website available at https://people.com.

19.      Non-party BuzzFeed, Inc. ("BuzzFeed") is a Delaware corporation with a principal place of business at 111 E. 18th St 13th Floor, New York, NY 10003.  Non-party BuzzFeed is an Internet media, news and entertainment company that operates a popular entertainment website available at https://www.buzzfeed.com.

20.      Non-party The Arena Group Holdings, Inc. ("The Arena Group") is a Delaware entity with a principal place of business at 200 Vesey Street, 24th Floor, New York, NY, 10281. Non-party The Arena Group is a media company that owns and operates a variety of journalism and publishing brands, including but not limited to *The Spun* by Sports Illustrated and the website available at https://thespun.com.

21.      Nominal defendants JOHN DOES 1-100 and XYZ CORPORATIONS 1-100 ("Nominal Defendants"), which are unknown to Plaintiff, infringed Plaintiff's copyrights willfully, and otherwise caused harm to Plaintiff as set forth herein and did so as a consequence of their business with Defendant AFP and Getty Defendants.  As the identity of Defendant AFP and Getty Defendants' customers and business affiliates are within the exclusive possession of Defendant AFP and Getty Defendants, such information may only be revealed through discovery, and Plaintiff reserves the right, upon learning of the identities of said individuals or entities, to move to amend this Complaint to name these companies and individuals as defendants.

22.      Non-parties Bloomberg News, BNA, NYP Holdings, Inc., Heavy, Inc., Forbes Media LLC, Breitbart News Network, LLC, Media Storehouse, Ltd., The New York Times

Company, Dotdash Meredith, The Athletic Media Company, The Arena Group, and Buzzfeed, Inc., are collectively referred to hereinafter as the "Downstream Infringers."

## JURISDICTION AND VENUE

23.     This action arises under the federal Copyright Act, 17 U.S.C. §§ 101, *et seq.*  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b).

24.     This Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants have infringed Leong's copyrights within this District and, as a result, Leong has been harmed in this District by each of the Defendants.

25.     In particular, Defendant AFP and Getty Defendants have, without Leong's authorization, reproduced, distributed, publicly displayed, created derivative works, and held out for licensing infringing content in this District.

## FRANCISCO LEONG AND HIS WORK AS A PHOTOJOURNALIST

26.     Plaintiff Francisco Leong is a skilled photographer and photojournalist with over 20 years of experience capturing and curating photographs in connection with his personal and professional mission to visually portray world news and events.

27.     Since 2005, Leong has been registered with Portugal's Carteira Profissional de Jornalista (Journalists' Professional License Committee) ("CCPJ") under the professional name FRANCISCO LEONG.

28.     Leong's photographs depict a range of newsworthy events, from pivotal political events to international armed conflicts to major sporting events.

29.     Throughout his career, Leong has relied on his creativity, intuition, skill, artistic ability, and professional experience to capture newsworthy images, often under challenging, stressful, and even life-threatening conditions.

30.     In 2014, while covering civil strife in Ukraine, Leong's vehicle came under heavy gunfire.  In 2012, during conflict in Aleppo, Leong was kidnapped by Syrian militants.  And in 2011, Leong was severely injured in a car crash while fleeing violence in Libya, which later required six months of physical rehabilitation.  In each case, Leong was fortunate to escape with his life and, whenever possible, breathtaking images of global news stories (examples below):

 

31.     Leong's photographs exhibit creativity, originality, and are the result of Leong's intellectual efforts as a photojournalist.

## AFP AND ITS COMMERCIAL ACTIVITIES

32.     AFP is a French global news agency headquartered in Paris, France and founded in 1835.  AFP has over 2,400 staff and news bureaus in 160 countries in 201 locations.

33.     While AFP reports the news directly through its website at AFP.com, AFP's primary business is to generate editorial content that newspapers and news reporting organizations license from AFP and incorporate into their own global news reporting.

34.     AFP develops its editorial content through "stringers" (freelancers or independent contractors) and "staffers" (editorial employees) that produce the written and audiovisual content

made available through the AFP Wire Service, a subscription service that allows subscribers (primarily news outlets) to access content that is often critical to the reporting of global news.

35.     AFP also makes editorial content available in other ways.  For example, AFP licenses editorial photographs through AFP Forum (www.afpforum.com) (as shown below):



36.     Through AFP Forum (formerly ImageForum), AFP distributes photographs through its international wire and databank, which allows subscribers to access publicly displayed photos either as part of a subscription plan or on an "a la carte" basis.  *Agence France Presse v. Morel*, 934 F. Supp. 2d 547, 552 (S.D.N.Y. 2013).

37.     AFP uses the designation "AFP" with each AFP Forum photograph (as shown below):



38.     AFP also licenses content through Getty Defendants' internet platform at www.gettyimages.com (the "Getty Defendants' Platform")—often credited "AFP via Getty Images"—as part of an ongoing partnership (the "AFP-Getty Partnership").

39.     Getty Defendants use the "gettyimages" watermark on publicly displayed photographs available on the Getty Defendants' Platform (as shown below):



40.     Getty Defendants also use the "Getty Images" identifier with the photograph metadata or "IPTC" on Getty Defendants' Platform (as shown below):



41.     AFP also commercializes its editorial content by licensing it to Defendant Media Storehouse, Ltd. ("Media Storehouse"), which sells wall art and gift items that feature AFP photographs.  *See* https://www.mediastorehouse.com/agence-france-presse-afp/.

## FRANCISCO LEONG'S PHOTOJOURNALISM WITH AFP

42.     Between February 20, 2005 and November 30, 2018, Leong captured, curated, and licensed a total of 34,716 photographs to AFP (the "Leong Photographs") under his professional, registered title FRANCISCO LEONG.  *See* Exhibit B.[1]

43.     Leong captured each Leong Photograph with a camera that automatically populated and correlated specific metadata to each Leong Photograph image file, including the author/creator "Francisco Leong"; the date and time at which the photograph was captured; and the location in which the photograph was captured ("Leong Photograph Metadata").

44.     With few exceptions, Leong selected each and every Leong Photograph from among a much larger set of photographs that Leong captured and then sent each Leong Photograph to AFP for authorized commercialization through AFP's various services and was solely responsible for deciding which photographs to send to AFP.

45.     After receiving a photograph from Leong, AFP would routinely distribute that Leong Photograph through the AFP Wire Service; add said photograph to the AFP Forum database for public display and licensing; and share said photograph with Getty Defendants for additional downstream public display and licensing.  On information and belief, in each such

---

[1] Of the total 34,716 Leong Photographs, Exhibits B-1 through Exhibit B-27 contain AFP Forum screen shots displaying 19,458 thumbnails of Leong's original photographs, some of which correspond to image files no longer in Leong's possession.  An additional 3,638 Leong Photographs are covered by U.S. copyright registrations.  *See* VA 2-146-419 (Nos. 194-239); VA 2-140-206 (Nos. 1-635); VA 2-141-022 (Nos. 1-715); VA 2-142-609 (Nos. 1-733); VA 2-142-577 (Nos. 1-732); VA 2-137-628 (Nos. 1-95); and VA 2-137-627 (Nos. 1-682).  Leong does not have the original photograph image files for the remaining 11,621 Leong Photographs due to a mechanical hard drive failure, and because AFP refuses to provide Leong with copies.  In this action, Leong intends to recapture these files that are exclusively within AFP/Getty Defendants' possession, custody, and control.

instance, the Leong Photograph Metadata was removed from the photograph, and the identifier "AFP" was added.

46.     Some of the Leong Photographs were captured while Leong was an AFP freelance photojournalist (also known as a "Stringer") from February 20, 2005 through October 31, 2010 (the "Stringer Period"), and the rest he captured as an AFP employee (also known as a "Staffer") from November 1, 2010 through November 30, 2018 (the "Staffer Period").

47.     At all times during the Stringer Period and Staffer Period, Francisco Leong understood that he was the sole owner of the Leong Photographs.  In fact, Leong secured twenty-one (21) U.S. Copyright Registrations during and immediately following the Staffer Period for all 8,657 original photograph image files in his possession (the "2018-19 Registered Works"). *See* Exhibit C.   In 2022, Leong secured twenty-four (24) U.S. Copyright Registrations utilizing AFP Forum screen shots in Leong's possession that displayed thumbnails of some of his unregistered photographs (the "2022 Registered Works").  *See* Exhibit D.

48.     At all times during the Stringer Period and the Staffer Period, Leong authorized and approved of AFP's commercialization of the Leong Photographs, as well as the attribution of AFP and Getty Defendants (as alleged below) on such photographs, across all of AFP's various avenues of commercial exploitation—including the AFP News Service, the AFP-Getty Partnership, and AFP Forum, and the aforementioned activities—all in exchange for hourly compensation during the Stringer Period, and in exchange for a salary with full employment benefits during the Staffer Period.

*AFP Stringer Period*

49.     During the Stringer Period, Leong captured, curated, and licensed over 10,000 photographs to AFP for editorial and commercial use (the "Stringer Photos"), but did not do so under a written contract.

50.     Despite the absence of a written contract, AFP commercialized the Stringer Photos with Leong's knowledge, authorization, and consent but, at all times, was aware that it was not the owner of the Stringer Photos.

51.     During the Stringer Period, AFP never claimed to own the Stringer Photos.

52.     In fact, during the Stringer Period, AFP typically did not assert ownership over photographs taken by AFP stringers.

53.     AFP's position during that time on its non-ownership of Stringer photographs was reflected in its treatment of former AFP photojournalist Walter Astrada.  Specifically, in 2008, AFP's Head of Photography emailed Astrada to invite him to discuss a deal wherein he and AFP would share future licensing revenues from Astrada's photographs.  On information and belief, if AFP believed in 2008 that it owned Astrada's photographs, it would not have invited Astrada to negotiate this revenue-share arrangement.

54.      During the Stringer Period, AFP understood that all photographs captured by Leong during the Stringer Period were owned by Leong.

55.     Under Portuguese law, the copyrights in the Stringer Photos captured by Leong during the Stringer Period were owned by Leong.  *See* Code of Copyright [Código do Direito de Autor e dos Direitos Conexos] ("CDADC"), Article 14(2).

*AFP Staffer Period*

56.     On November 1, 2010, Leong signed an AFP employment contract (the "2010

Agreement"), at which point Leong became a full-time employee (or "Staffer").  Leong did so to

gain access to photojournalism assignments outside of Portugal that would allow him to capture

some of the most important news events taking place around the world, and to become eligible

for important employee benefits for which Stringers were not eligible.

57.     Upon becoming a Staffer, Leong became eligible under Portuguese labor law for

several employee benefits, including but not limited to reimbursements for overnight stays

(known in Portuguese as "*pernoitas*") while Leong was away from home on assignment.[2]

58.     Thereafter, during the Staffer Period, Leong captured, curated, and licensed over

23,000 photographs to AFP for editorial use and commercial exploitation under the express

terms of Clause 7 of the 2010 Agreement.

59.     Specifically, Clause 7 of the 2010 Agreement (English translation reproduced

below)[3] purports to govern AFP's rights to use and exploit Leong's photographs:

> The journalist recognizes and accepts that in the fixed amount pay
> he receives, is included the cession to Agence France-Presse, on an
> exclusivity title, of the exploitation rights (reproduction,
> representation, adaptation and distribution), how many times the
> AFP deems it necessary, from the writings, images, sounds, videos,
> infographics made by him, by any means, in any language and in
> any form, namely digital, by all present or future media forms, on
> all present or future electronic storage devices, such as databases
> and online search engines, so AFP can market them directly or
> through its distributors, partners or branches, with its customers for
> the set of present and future products and services. The present

---

[2] Although Portuguese AFP Staffers were not eligible for union membership until 2018, as of November 1, 2010, Portuguese AFP Staffers such as Leong were already entitled to employee benefits under Portuguese labor laws and the Collective Labor Agreement between the Union of Journalists and the Portuguese Press Association.

[3] Pursuant to Fed. R. Civ. P. 8, Leong alleges this and other translations of Portuguese legal texts without prejudice to his right to proffer, as the case proceeds, certified translations from Portuguese law experts that may differ in material respects from the translations alleged herein.

encumbrance is valid for the entire time of the literary and artistic protection and for the whole world.

60.     Clause 7 of the 2010 Agreement does not meet the criteria of an assignment of ownership and thus does not rise to the level of a complete transfer of rights.

61.     Clause 7 of the 2010 Agreement does not assign or transfer Leong's ownership of copyrights in the Leong Photographs because it was not accompanied by a notarized public deed (*see* Article 44 of the CDADC); because it contains no "specific contractual provisions" about "the options covered and the relevant conditions of time, place and price applicable to their use" (Article 7-B(2) of the Journalist Statute); because the terminology used in Portuguese law to describe ownership (i.e., "titularidade") is absent (CDADC Article 11); and because no separate consideration was paid by AFP to Leong for a transfer of ownership, as Portuguese law requires. *See* Article 7B(1) of the Journalist Statute.

62.     At the time the 2010 Agreement was fully executed, a transfer of copyright ownership in the Leong Photographs to AFP would have been inconsistent with industry practice, as photojournalists generally retain ownership of copyrights in their photographs.

63.     Leong signed the 2010 Agreement intending to grant AFP the right to *use* the Leong Photographs, and not with the intention to transfer copyright ownership to AFP. Accordingly, Clause 7 of the 2010 Agreement is a license of rights to AFP to use the Leong Photographs, not an assignment of rights to AFP.

64.     While Clause 7 of the 2010 Agreement is a license of rights, the precise terms of such license are ambiguous at least because Clause 7 does not specify which Leong Photographs are covered by the grant (or whether such grant is retrospective, prospective, or both), and because it only grants four "exploitation rights" to AFP (reproduction, representation, adaptation

and distribution), but *not* the rights to sublicense or communicate the Leong Photographs to the

public,[4] both of which the parties intended that AFP be permitted to exploit.

65. Clause 14 of the 2010 Agreement (English translation reproduced below) selects

the law that governs the 2010 Agreement:

> Cases not provided in the present contract will be regulated in
> accordance to the applicable Portuguese labor law, namely, the
> 2009 Labor Code, Regulated by 35/2004 Law of 29 July, as well as
> by the Collective Labor Agreement between the Union of
> Journalists and the Portuguese Press Association, published in the
> Labor and Employment Bulletin, of 30/06/2010.

66. Clause 14 of the 2010 Agreement applies the 2009 Labor Code and the Collective

Labor Agreement between the Union of Journalists and the Portuguese Press Association

("CLA") as the law applicable to the 2010 Agreement.

67. Paragraph 47 of the CLA provides as follows:

> *Clause 47.a — Copyright on journalistic works*
>
> 1 — To journalistic works, the rules provided for in the Journalist
> Statute and, alternatively, the Code of Copyright [Código do
> Direito de Autor e dos Direitos Conexos ("CDADC")] and Related
> Rights apply.
> 2 — The journalist has the exclusive right to authorize, by himself
> or by his representatives, all uses of works not included in the
> object of the employment contract, under the terms of paragraph 3
> of article 7-B of the Journalist Statute, namely, communications to
> the public, or transmission in whole or in part, of the respective
> copyright.
> 3 — Authorization must be subject to agreement under the terms
> set out in the Journalist Statute.
> 4 — In the absence of an agreement, the provisions of the Protocol
> that will be signed between the parties granting this CCT will
> apply, in case the journalist and his employer have expressed, in
> writing, their adherence to the aforementioned Protocol.

---

[4] Under Portuguese copyright law, the right to "communicate to the public" must be "established through specific contractual provisions… and must contain the options covered and the relevant conditions of time, place and price applicable to their use."  See Article 7-B(2) of the Journalist Statute.  This is roughly analogous to the "public display" right under U.S. copyright law (one of several rights within a U.S. copyright holder's "bundle of rights").  The right to communicate to the public and the "public display" right are separate and distinct from the distribution rights under Portuguese and U.S. copyright law, respectively.  *Compare* 17 U.S.C. § 106(5) *with* 17 U.S.C. § 106(3).

68.     Thus, per Clause 14 of the 2010 Agreement, the CDADC and Journalist Statute govern copyright issues arising under the 2010 Agreement.

69.     Whether under U.S. law or Portuguese law, a court must resolve ambiguity in a copyright license agreement by considering matter outside the four corners of the contract, namely, the intent of the parties and their course of dealings, to determine the terms of the contract consistent with applicable statutory provisions.  *See* Article 236 of the Portuguese Civil Code.

70.     Resolving these ambiguities through consideration of the intentions of the parties, their course of dealings, and relevant industry practices—and in view of the Portuguese copyright law provisions applicable to the 2010 Agreement as per Clause 14—the only plausible and reasonable reading of Clause 7 of the 2010 Agreement is that such clause granted AFP an exclusive license to commercialize and exploit the Leong Photographs, including but not limited to all of the activities that AFP undertook with respect to the Leong Photographs prior to April 17, 2019, and to include attribution of AFP and Getty Defendants (as alleged below) on and in connection with such photographs.

## **AFP AND GETTY WILLFULLY INFRINGE DANIEL MOREL'S COPYRIGHTS**

71.     In a prior lawsuit within this District, AFP and Getty Defendants were found liable for copyright infringement following their unauthorized use of a photojournalist's photographs.  *See Agence France Presse v. Morel*, No. 10-cv-2730 (AJN) (S.D.N.Y.)  The *Morel* litigation revealed facts about AFP and the Getty Defendants, as well as the way they do business together under the AFP-Getty Partnership, which are relevant to the facts of this case.

72.     Approximately seven (7) months before AFP and Leong entered the 2010 Agreement, Defendant AFP filed suit in this District against photojournalist Daniel Morel

seeking, inter alia, a declaratory judgment that AFP did not infringe Morel's copyrights in

photographs depicting the devastation of a 2010 Haitian earthquake ("Morel Photographs").

73.     During the *Morel* litigation, it was revealed that AFP sometimes (if not routinely)

circulates a "kill notice" to notify partners (e.g., Getty Defendants) as well as photograph

licensees that a photograph should no longer be used because it is under a claim of infringement.

74.     On January 14, 2010, AFP circulated the below "kill notice" for the Morel

Photographs just one day after it became aware of a potential copyright dispute with Morel:



75.     During the litigation, it was also revealed that Getty Defendants circulated similar

notifications to Getty licensees instructing them to discontinue use of the Morel Photographs.

76.     On November 22, 2013, a jury found that AFP and Getty willfully infringed

Morel's copyrights in these photographs and violated Morel's copyright management

information and awarded Morel $1.2 million for only eight (8) photographs.

77.     On August 13, 2014, AFP and Getty Defendants filed a motion for judgment as a

matter of law, a new trial, and/or to remit the jury's award to a lower amount.  The Court

declined to remit the jury's $1.2 million award and found that the jury could have properly

concluded that Getty Defendants intended "to enable the continued licensing of the [falsely credited] images to Getty's customers" such that "Getty's continued distribution of the [falsely credited] images following AFP's kill notice satisfied all of the elements required by § 1202(a)." *Agence France Presse v. Morel*, No. 10-cv-2730 (AJN), 2014 WL 3963124, at \*8 (S.D.N.Y. Aug. 13, 2014).

78.     Even though AFP was already well aware of the allegations in the *Morel* litigation before Leong and AFP entered the 2010 Agreement in November 2010 and could have proposed (if not insisted upon) language in Clause 7 of the 2010 Agreement that unequivocally transferred copyright ownership in the Leong Photographs, AFP proposed the language of Clause 7 of the 2010 Agreement in the exact form in which it was signed and fully executed by Leong and AFP.

79.     This is particularly true given that Portuguese law retains the ownership of copyrights in the "intellectual creator of the work." CDADC Article 11.

### AFP'S WRONGFUL TERMINATION OF LEONG

80.     As a Staffer with AFP, Leong captured photographs in various locations around the world and provided those photographs to AFP, but AFP failed to compensate him for overtime pay and for over 600 *pernoitas* (overnight stays) while away from home on assignment.

81.     During the Staffer Period, Leong requested reimbursements for unpaid overtime and *permoitas* from AFP on multiple occasions, but AFP did not comply.

82.     In late 2017, AFP's Lisbon Bureau closed.  AFP's Madrid Bureau began managing AFP's Portuguese journalists and staff and, contrary to Portuguese labor law, pressured them to be available and "on call" 24 hours per day, 7 days per week, even on days off.

83.     In response to this shift in management, in January 2018, AFP Portuguese journalists petitioned for and secured eligibility for domestic professional journalist press cards, allowing them to join the Portuguese journalist labor union "Sindicato dos Jornalistas" ("SJ"). Thereafter, the SJ began to advocate for AFP's Portuguese journalists through negotiations with AFP, including by negotiating for paid leave, as well as overtime and *pernoitas* reimbursements.

84.     Although Leong became an SJ union member in 2018, AFP continually refused to reimburse Leong for past *pernoitas* and overtime.  Accordingly, in September 2018, Leong formally claimed these reimbursements by sending a letter to AFP from his lawyer, Joao Poelho, seeking reimbursement for over 600 overnight stays and overtime since 2010.

85.     On October 3, 2018, the SJ union lawyer Paula Tanganho met with AFP representatives, including AFP's Bureau Chief for Portugal and Spain, Patrick Rahir, to discuss labor violations occurring at AFP's Lisbon office.

86.     On November 25, 2018, Leong was elected as the SJ union delegate for the AFP journalists in Portugal and, on or about November 29, 2018, AFP was notified of this.

87.     The next day, on November 30, 2018—after *14 years* with AFP, and without warning—AFP suspended Leong via an emailed "Notice of Fault"—that falsely alleged misconduct and dereliction of duties.

88.     On March 29, 2019, AFP wrongfully terminated Leong's employment.

89.     On April 8, 2019, Leong filed a claim against AFP in Portuguese labor court ("April 2019 Labor Proceeding") seeking to redress his wrongful termination by AFP.

90.     On April 17, 2019, Leong wrote to AFP and demanded, *inter alia*, that AFP cease and desist "from disclosing and/or publishing and/or economically exploit[ing]" the Leong Photographs.

91.     On May 19, 2019, after considering testimony from various fact witnesses and documentary proof presented by AFP and Leong's counsel, the Portuguese Labor Court enjoined AFP's termination of Leong, finding that Leong's termination was likely wrongful.

92.     In so finding, the Portuguese Labor Court examined AFP's Notice of Fault, which claimed that, on October 9, 2018, Leong was assigned to cover the Brazilian Minister of Foreign Affairs' visit to Portugal, and that Leong violated his work obligations to AFP because he did not cover this visit or tell anyone else to cover it.

93.     The Portuguese Labor Court found that AFP's claim in the Notice of Fault was without evidence and likely false after considering evidence that, on October 9, 2018, Leong emailed Gabriel Bouys, AFP's coordinator in Madrid, to ask whether he should cover the event, and Bouys did not respond until approximately 4 pm on October 10, 2018—*after the event had already taken place*—asking Leong to send photographs from the Brazilian politician's visit.

94.     Similarly, the Portuguese Labor Court examined AFP's Notice of Fault claiming that Leong failed to cover a forest fire in Portugal that reportedly began on Leong's day off from work—Saturday, October 6, 2018 at 10:50 pm—and that Leong violated his work obligations to AFP in failing to do so, and in failing to ensure that others would cover the event.

95.     AFP's claim that Leong failed to cover the forest fire was supported by Bureau Chief Patrick Rahir's testimony under penalty of perjury that co-worker Levi Fernandes telephoned Leong at approximately 8:22 am the next day asking him to cover the disaster.

96.     Again, the Portuguese Labor Court found that AFP's basis for termination were unsupported and likely false after considering evidence that (1) the fire began during Leong's scheduled day off, (2) that it was not Leong's responsibility to assign a different photojournalist, and, (3) contrary to Patrick Rahir's testimony that Levi Fernandes telephoned Leong on the

morning of October 7, Levi Fernandes' own testimony that *he never telephoned Leong on October 7, 2018 to alert him to the forest fire.*[5]

97.     Based on these findings of the April 2019 Labor Proceeding, the Portuguese Labor Court issued a preliminary injunction that suspended AFP's wrongful termination of Leong pending a final judgment in the proceeding.

98.     AFP intentionally falsified and misrepresented "performance" issues to support a pretextual termination of Leong's lengthy employment with AFP because AFP feared that honoring overtime and *pernoitas* claims made by Leong—the JS union representative for Portuguese AFP journalists—would encourage other Portuguese AFP journalists to seek such reimbursements, all of which would come at significant expense to AFP.

99.     AFP knowingly created a false basis to terminate Leong's employment to avoid the considerable costs of complying with Portuguese labor law, and to retaliate against Leong and the SJ union he represented, and, in doing so, willfully and materially breached the 2010 Agreement with Leong.

100.     Specifically, AFP's Notice of Fault dated November 30, 2018 was prepared with knowledge that Gabriel Bouys, AFP's coordinator in Madrid, never actually asked Leong to cover the Brazilian Minister of Foreign Affairs' visit to Portugal on October 9, 2018 until *after* the event already took place, and with knowledge that Levi Fernandes never actually telephoned Leong at approximately 8:22 am on October 7, 2018 to alert him to the importance of covering the forest fire.

---

[5] Although Levi Fernandes' October 7, 2018 email regarding coverage of the forest fire was sent to a distribution list with all of AFP's Portuguese journalists, and was not directed specifically to Leong, AFP did not institute disciplinary proceedings against any of the other Portuguese AFP journalists for failing to cover the disaster.

101.    Thus, when AFP described Leong's "failures" to cover these events in its Notice of Fault and the testimony of its Bureau Chief, Patrick Rahir, and relied on such "failures" to terminate Leong's employment, AFP knowingly falsified damaging information about Leong as an excuse to terminate his employment with AFP, and to avoid reimbursing Leong for the *pernoitas* and overtime compensation to which he was entitled under Portuguese law, which were willful and material breaches Leong's 2010 Agreement with AFP.

102.    AFP's wrongful termination of Leong's employment constituted a willful and material breach of the 2010 Agreement at least because such conduct violated Articles 14 and 52 of the CLA, and because such conduct violated Articles 126, 129, and 338 of the Portuguese Labour Code, under which AFP had a duty to treat Leong fairly and reasonably, and which it breached by knowingly falsifying damaging information about Leong as an excuse to terminate his employment with AFP.

103.    AFP's wrongful termination of Leong's employment constituted so substantial and fundamental a breach as to strongly tend to defeat the object of the parties in making the 2010 Agreement, and giving rise to a right of rescission, at least because AFP wrongfully terminated Leong under false pretenses, and also because Leong never obtained the benefit of his bargain under the 2010 Agreement having been denied compensation for *pernoitas* and overtime compensation over a period of nearly eight (8) years amounting to nearly €100,000.

## **AFP'S WILLFUL INFRINGEMENT**

### *Leong's Termination of AFP's License*

104.    As alleged above, AFP willfully and materially breached the 2010 Agreement by wrongfully terminating Leong's employment with AFP under false pretenses.

105. AFP's willful and material breach of the 2010 Agreement gave rise to a right to rescind the 2010 Agreement and created a legal basis for Leong to terminate AFP's license under Clause 7 of the 2010 Agreement.

106. In the April 17 Email, Leong repudiated Clause 7 of the 2010 Agreement and demanded that AFP cease and desist "from disclosing and/or publishing and/or economically exploit[ing]" the Leong Photographs.

107. The April 17 Email terminated AFP's license to use and commercially exploit the Leong Photographs under Clause 7 of the 2010 Agreement.

108. Because Leong's April 17 Email repudiated and rescinded the 2010 Agreement and terminated AFP's license under Clause 7 of the 2010 Agreement, AFP's use of the Leong Photographs after April 17, 2019—as well as all other third-party use of the Leong Photographs authorized by AFP as of that date—was unauthorized and infringed Leong's copyrights in the Leong Photographs.

*AFP's Willful Infringement*

109. Despite the termination of AFP's license upon transmission of Leong's April 17 Email, AFP continued reproducing, distributing, publicly displaying, marketing, selling, creating derivative works from, holding out for license, and otherwise commercially exploiting the Leong Photographs, which amounted to infringement of the Leong Photographs.

110. Although discovery is required to reveal the full extent of AFP's infringement, by way of example, following Leong's April 17 Email, AFP continued to hold out for license and publicly display the Leong Photographs via AFP Forum (as shown below):



111.    By way of further example, following Leong's April 17 Email AFP continued to commercialize the Leong Photographs in conjunction with Media Storehouse through the sale of wall art and gift items featuring the Leong Photographs.  *See* Exhibit E.

112.    By continuing to publicly display and offer the Leong Photographs for licensing via AFP Forum, AFP also continued its use of the "AFP" identifier in connection with the Leong Photographs on AFP Forum, which AFP knew to be false information conveyed in connection with the Leong Photographs following the April 17 Email's termination of AFP's license to use the Leong Photographs.

113.    AFP knew that its use of the "AFP" identifier would induce, enable, and facilitate the downstream infringement of its subscribers and customers, and would conceal the infringement of its partners and licensees (e.g., Getty Defendants and Media Storehouse) because the "AFP" identifier falsely suggested to third parties that AFP still had the right to use or authorize use of those photographs when that was not the case.  Thus, this false CMI concealed AFP's infringement and induced others to "license" the Leong Photographs from AFP (which

lacked the right to license them), thereby inducing those third parties to infringe Leong's copyrights in the Leong Photographs.

114.    By continuing to publicly display and offer the Leong Photographs for licensing via AFP Forum after receiving the April 17 Email, AFP distributed the Leong Photographs with CMI that it knew had been altered (e.g., to include the false designation "AFP") and removed (e.g., to exclude the Leong Photograph Metadata CMI) without Leong's authority.

115.    In doing so, AFP knew and/or had reasonable grounds to know that such distribution would induce, enable, facilitate, or conceal AFP's infringement and the infringement of its downstream partners, subscribers, and customers because the "AFP" identifier and the absence of the Leong Photograph Metadata falsely suggested to third parties that AFP still had the right to use or authorize use of those photographs when that was not the case.  Thus, this false CMI concealed AFP's infringement and induced others to "license" the Leong Photographs from AFP (which lacked the right to license them), thereby inducing those third parties to infringe Leong's copyrights in the Leong Photographs.

116.    After receiving the April 17 Email, AFP continued to exploit the Leong Photographs through the AFP-Getty Partnership, including by purporting to license or otherwise provide the Leong Photographs to Getty Defendants for the purpose of third-party licensing through Getty Defendants' licensing platform on gettyimages.com.

117.    After receiving the April 17 Email, AFP purported to license or otherwise provide the Leong Photographs to Media Storehouse for the purpose of making and selling infringing wall posters and other items that used the Leong Photographs.

118.    AFP's use and commercial exploitation of the Leong Photographs after April 17, 2019 constituted willful infringement of Leong's copyrights in the Leong Photographs, including but not limited to willful infringement of the 2022 Registered Works.

119.    After receiving the April 17 Email, AFP knew that its continuation of the abovementioned use and commercial exploitation of the Leong Photographs was not authorized by Leong but continued anyway.  This conduct infringed Leong's copyrights in the Leong Photographs.  AFP continued such use and commercial exploitation anyway, however.

120.    After receiving the April 17 Email, AFP acted with reckless disregard for, or willful blindness to whether AFP's continued use and commercial exploitation of the Leong Photographs infringed Leong's copyrights in the Leong Photographs.

121.    AFP's abovementioned acts amount to willful infringement of Leong's copyrights in the 2022 Registered Works as well as multiple CMI violations.

122.    By continuing to exploit the Leong Photographs through the AFP-Getty Partnership, and by continuing to purport to license or otherwise provide the Leong Photographs to Media Storehouse, AFP committed additional acts of willful direct and/or secondary infringement and CMI violations.

## **GETTY DEFENDANTS' WILLFUL INFRINGEMENT**

123.    During the Stringer Period and the Staffer Period, AFP and Getty Defendants cooperated as part of the AFP-Getty Partnership to offer for third-party licensing, and otherwise commercially exploit, the Leong Photographs through Getty Defendants' Platform.

124.    Getty Defendants continued such activities after April 17, 2019, as shown below:



125. As shown above, Getty Defendants continued such activities at least through December 2019—including but not limited to the reproduction, public display, distribution, holding out for licensing, and creation of derivative works—on Getty Defendants' Platform with respect to all Leong Photographs.

126. As a result of the April 17 Email terminating AFP's license to use and otherwise commercially exploit the Leong Photographs—including through the AFP-Getty Partnership— such use of the Leong Photographs by Getty Defendants after April 17, 2019 was undertaken without Leong's authorization, and intentionally and willfully infringed Leong's copyrights in the Leong Photographs.

127. On information and belief, after April 17, 2019, multiple third parties accessed one or more Leong Photographs on Getty Defendants' Platform.

128. On information and belief, after April 17, 2019, one or more third parties paid Getty Defendants to license rights to use one or more Leong Photographs through Getty Defendants' Platform.

129.    On information and belief, under the AFP-Getty Partnership, AFP is contractually obligated to notify Getty Defendants of a claim of infringement regarding photographs that AFP provides to Getty.

130.    As demonstrated in the *Morel* case, AFP sometimes (if not routinely) circulates a "kill notice" to notify partners (e.g., Getty Defendants), licensees, and customers that a photograph should no longer be used because it is under a claim of infringement.  In the *Morel* case, AFP circulated a "kill notice" on January 14, 2010, just one day after AFP learned of Daniel Morel's claim of infringement and months before a lawsuit was filed.

131.    On July 4, 2019, following the Portuguese Labor Court's May 19, 2019 decision enjoining Leong's wrongful termination by AFP, AFP and Leong entered into a settlement agreement whereby AFP agreed to pay Leong amounts owed and to settle the labor claims (the "July 4, 2019 Settlement Agreement").  The July 4, 2019 Settlement Agreement expressly carved out Leong's copyright claims against AFP.

132.    At the time AFP entered the July 4, 2019 Settlement Agreement (if not before), AFP knew of Leong's potential copyright claims related to the Leong Photographs, and knew that the July 4, 2019 Settlement Agreement expressly carved out Leong's copyright claims against AFP, such that Leong would have the right to bring those claims at a later date.

133.    At the time AFP entered the July 4, 2019 Settlement Agreement (if not before), AFP knew that continued commercial exploitation of the Leong Photographs posed a significant business risk for itself and its partners that justified alerting its partners, licensees, and customers to the infringement claims such that they should discontinue all use and commercial exploitation of the Leong Photographs, or else risk significant liability.

134.    On information and belief, on or about the time AFP entered the July 4, 2019 Settlement Agreement (if not before), AFP circulated a "kill notice" for the Leong Photographs to AFP's partners (e.g., Getty Defendants), licensees (e.g., Media Storehouse), and customers, just as it did for the Morel Photographs in 2010 (*see supra*, Paragraph 74), or otherwise notified those third parties of Leong's claim of infringement regarding the Leong Photographs.

135.    On information and belief, Getty Defendants continued reproducing, distributing, creating derivative works from, publicly displaying, holding out for licensing, and otherwise commercially exploiting the Leong Photographs through Getty Defendants' Platform after July 4, 2019 with knowledge that such uses of the Leong Photographs were unauthorized.

136.    On December 27, 2019, Leong filed a second labor case in Portugal pertaining to the validity of Clause 7 of the 2010 Agreement, the clause under which Leong had previously licensed AFP to use the Leong Photographs.

137.    At the time Leong filed a second labor case in Portugal (if not before), AFP knew that continued commercial exploitation of the Leong Photographs posed a significant business risk that justified alerting its partners, licensees, and customers to Leong's potential infringement claims and to discontinue all use and commercial exploitation of the Leong Photographs.

138.    In the alternative, to the extent a "kill notice" was not already circulated by Getty on or about the time AFP entered the July 4, 2019 Settlement Agreement, on information and belief, on or about the time Leong filed a second labor case in Portugal (if not before), AFP circulated a "kill notice" for the Leong Photographs to AFP's partners (e.g., Getty Defendants), licensees (e.g., Media Storehouse), and customers, just as it did for the Morel Photographs in 2010 (*see supra*, Paragraph 74), or otherwise notified those third parties of Leong's claim of infringement regarding the Leong Photographs.

139.    On information and belief, Getty Defendants continued reproducing, distributing, creating derivative works from, publicly displaying, holding out for licensing, and otherwise commercially exploiting the Leong Photographs through Getty Defendants' Platform after December 27, 2019 with knowledge that such uses of the Leong Photographs were unauthorized.

140.    On July 24, 2020, Michael G. Oliver, counsel for Leong, sent a notice of investigation of copyright claims (the "July 24 Notice") with respect to eight Leong Photographs to Kjelti Kellough, General Counsel for Getty Defendants.  On August 6, 2020, Mathew Higbee, counsel for AFP, replied to the July 24 Notice stating that the July 24 Notice had been forwarded by the Getty Defendants to AFP for a response (the "August 6 Response").

141.    In the alternative, to the extent "kill notices" were not already circulated by Getty on or about the time AFP entered the July 4, 2019 Settlement Agreement, or on or about the time Leong filed a second labor case in Portugal, on information and belief, on or about the time that the Getty Defendants received the July 24 Notice, AFP was notified by Getty Defendants about the July 24 Notice and at that time (if not before), AFP circulated a "kill notice" for the Leong Photographs to AFP's partners (e.g., Getty Defendants), licensees (e.g., Media Storehouse), and customers, just as it did for the Morel Photographs in 2010 (*see supra*, Paragraph 74), or otherwise notified those third parties of Leong's claim of infringement regarding the Leong Photographs.

142.    On information and belief, Getty Defendants continued reproducing, distributing, creating derivative works from, publicly displaying, holding out for licensing, and otherwise commercially exploiting the Leong Photographs through Getty Defendants' Platform after April 17, 2019 with knowledge that such uses of the Leong Photographs were unauthorized.

143.    On information and belief, Getty Defendants continued reproducing, distributing, creating derivative works from, publicly displaying, holding out for licensing, and otherwise commercially exploiting the Leong Photographs through Getty Defendants' Platform after April 17, 2019 with knowledge that such uses of the Leong Photographs were infringing.

144.    On information and belief, Getty Defendants continued reproducing, distributing, creating derivative works from, publicly displaying, holding out for licensing, and otherwise commercially exploiting the Leong Photographs through Getty Defendants' Platform after April 17, 2019 with reckless disregard for whether Getty Defendants' use of the Leong Photographs was unauthorized or infringing.

145.    Getty Defendants were aware of the infringement at least as of July 24, 2020 (if not long before) when they received the July 24 Notice but did not take down any of the Leong Photographs for several weeks after receiving the July 24 Notice.

146.    Even after the July 24 Notice, the Getty Defendants received notice that its continued uses of the Leong Photographs were infringing but continued reproducing, distributing, creating derivative works from, publicly displaying, holding out for licensing, and otherwise commercially exploiting the Leong Photographs, which constituted willful copyright infringement of the Leong Photographs.

147.    By continuing to publicly display and offer the Leong Photographs for licensing via Getty Defendants' Platform, Getty Defendants also continued its use of the "gettyimages" watermark on photographs, as well as the "Getty Images" identifier on "IPTC" photograph metadata, available on the Getty Defendants' Platform, each of which Getty Defendants knew to be false information conveyed in connection with the Leong Photographs following notice of Leong's copyright infringement claims, as described above.

148.     In doing so, Getty Defendants knew that their uses of the "gettyimages" watermark and of the "Getty Images" identifier on "IPTC" photograph metadata would each separately and independently induce, enable, and facilitate the downstream infringement of its subscribers and customers, and would conceal Getty Defendants' infringement because each falsely suggested to third parties that Getty Defendants had the right to use or authorize use of those photographs when that was not the case.  Thus, this false CMI concealed Getty Defendant's infringement and induced others to "license" the Leong Photographs from Getty Defendants (which was without authorization to license them), thereby inducing those third parties to infringe Leong's copyrights in the Leong Photographs.

149.     By continuing to publicly display and offer the Leong Photographs for licensing via Getty Defendants' Platform following notice of Leong's copyright infringement claims, as described above, Getty Defendants distributed the Leong Photographs with CMI that it knew to be false, and knew had been altered (e.g., to include the false watermark "gettyimages" and the false IPTC metadata with the "Getty Images" identifier), without Leong's authority.

150.     In doing so, Getty Defendants knew and/or had reasonable grounds to know that such distribution would induce, enable, facilitate, or conceal Getty Defendants' infringement and the infringement of its downstream partners, subscribers, and customers because the "Getty Images" identifier on "IPTC" photograph metadata and the watermark "gettyimages" each falsely suggested to third parties that Getty Defendants had the right to use or authorize use of those photographs when that was not the case.  Thus, this false CMI concealed Getty Defendants' infringement and induced others to "license" the Leong Photographs from Getty Defendants (which lacked the right to license them), thereby inducing those third parties to infringe Leong's copyrights in the Leong Photographs.

151.    As of December 30, 2021, when the 2021 Action was filed, Getty Defendants were still reproducing, distributing, creating derivative works from, publicly displaying, holding out for licensing, and otherwise commercially exploiting many Leong Photographs in blatant and willful disregard for Leong's copyrights in the Leong Photographs.

## DOWNSTREAM INFRINGERS

152.    On December 30, 2021, Leong filed the 2021 Action against AFP, Getty Defendants and Nominal Defendants for, inter alia, copyright infringement related to those defendants' unauthorized use of the Leong Photographs.

153.    In the *Morel* case, the litigation commenced on March 26, 2010, and Getty Defendants notified their customers and licensees that the Morel Photographs were infringing and should be removed approximately 10 to 14 days later.

154.    Under Section 8(c) of Getty Defendants' Content License Agreement with their licensees, Getty Defendants are obligated to notify licensees "that any content may be subject to a claim of infringement of a third party's right for which Getty Images may be liable," and require its licensees "to immediately, and at [their] own expense: cease using the content, delete or destroy any copies; and ensure that [their] clients, distributors and/or employer do likewise." *See* https://www.gettyimages.com/eula.

155.    On information and belief, the "AFP/Getty Images License Agreement" and the "AFP Subscription Agreement" will show the revenue sharing of licensing fees found under the "AFP/Getty Images License Agreement Schedule" and other material terms, and set forth AFP's obligation to notify Getty to immediately cease using works that are subject to a claim of infringement.  See *AFP v. Morel et. al.*, Dkt. 170., Case 1:10-cv-02730-AJN, June 8, 2012.[6]

---

[6] The "AFP/Getty Images License Agreement" and the "AFP Subscription Agreement" and "AFP/Getty Images License Agreement Schedule" are filed under seal.

156.    On information and belief, by January 2022 (if not before), Getty Defendants had notified all customers and licensees that had acquired a Leong Photograph from Getty Defendants and instructed such customers and licensees to discontinue any such use of the Leong Photographs.  At the time of this filing, however, Leong does not have sufficient knowledge without discovery to know whether notice, in the form of a kill notice or otherwise, was provided to the Downstream Infringers to know whether their violations were willful and thus have named them as non-parties until discovery demonstrates that each had notice.

157.    Despite Getty Defendants' duty to notify, each of the Downstream Infringers continued to use and refused to discontinue their respective unauthorized and infringing uses of the Leong Photographs, as alleged in detail below, including, on information and belief, the 2022 Registered Works.

158.    AFP and Getty Defendants each knew or had reason to know of, and materially contributed to the Downstream Infringers' infringement.

*NYP Holdings, Inc.'s Infringement*

159.    On August 25, 2019, Leong secured U.S. Copyright Registration No. VA 2-169-664, which covered the below photograph:



160.    On or about May 26, 2020, NYP Holdings, Inc. accessed Getty Defendants'
Platform, obtained a copy of the above Leong Photograph, and, on May 26, 2020, published a
New York Post article entitled *Stanley Ho, flashy casino kingpin of Macau, dead at 98* that
featured the above Leong Photograph with Leong's name excluded from the photo credit (as
shown below):



161.    As of the date of this filing, NYP Holdings, Inc. is still publicly displaying the
above Leong Photograph at the following URL: https://nypost.com/2020/05/26/stanley-ho-
flashy-casino-kingpin-of-macau-dead-at-98/.

162.    NYP Holdings, Inc. has continued to distribute, publicly display, and
commercially exploit this Leong Photograph in a manner that infringes Leong's copyright.

163.    AFP and Getty Defendants each knew or had reason to know of, and materially
contributed to NYP Holdings, Inc.'s infringement described above, and thus are contributorily
liable for the resulting harm to Leong.

164.    AFP and Getty Defendants directly benefitted financially from NYP Holdings, Inc.'s infringement described above and had the right and ability to supervise and control such infringement, and thus are vicariously liable for the resulting harm to Leong.

*Breitbart News Network, LLC's Infringement*

165.    On or about May 26, 2020, Breitbart News Network, LLC accessed Getty Defendants' Platform, obtained a copy of the above Leong Photograph, and, on May 26, 2020, published an article entitled *Macau Casino Tycoon Stanley Ho Dies Aged 98* that featured the above Leong Photograph with Leong's name excluded from the photo credit (as shown below):



166.    As of the date of this filing, NYP Holdings, Inc. is still publicly displaying the above Leong Photograph at the following URL: https://www.breitbart.com/news/macau-casino-tycoon-stanley-ho-dies-aged-98/.

167.    Breitbart News Network, LLC has continued to distribute, publicly display, and commercially exploit this Leong Photograph in a manner that infringes Leong's copyright.

168.     On December 7, 2018, Leong secured U.S. Copyright Registration No. VA 2-125-790, which covered the below photograph:



169.     On or about October 6, 2021, Breitbart News Network, LLC accessed Getty Defendants' Platform, obtained a copy of the above Leong Photograph, and, on October 6, 2021, published an article entitled *Report: Amazon-Owned Twitch Suffers Massive Data Leak* that featured the above Leong Photograph (as shown below):

 

170.     As of the date of this filing, Breitbart News Network, LLC is still publicly displaying the above Leong Photograph at the following URL: https://www.breitbart.com/economy/2021/10/06/report-amazon-owned-twitch-suffers-massive-data-leak/.

171.     Breitbart News Network, LLC has continued to distribute, publicly display, and commercially exploit this Leong Photograph in a manner that infringes Leong's copyright.

172.     AFP and Getty Defendants each knew or had reason to know of, and materially contributed to Breitbart News Network, LLC's infringement described above, and thus are contributorily liable for the resulting harm to Leong.

173.     AFP and Getty Defendants directly benefitted financially from Breitbart News Network, LLC's infringement described above and had the right and ability to supervise and control such infringement, and thus are vicariously liable for the resulting harm to Leong.

_The Arena Group's Infringement_

174.     On September 9, 2019, Leong secured U.S. Copyright Registration No. VA 2-172-983, which covered the below photograph:



175.   On or about February 11, 2020, The Arena Group accessed Getty Defendants'
Platform, obtained a copy of the above Leong Photograph, and, on February 11, 2020, published
an article on The Spun by Sports Illustrated entitled *Video: Pro Surfer Hospitalized After
Horrifying Crash* that featured the above Leong Photograph (as shown below):



176.   As of the date of this filing, The Arena Group is still publicly displaying the
above Leong Photograph at the following URL: https://thespun.com/more/top-stories/video-pro-
surfer-hospitalized-after-horrifying-crash.

177.   The Arena Group has continued to distribute, publicly display, and commercially
exploit this Leong Photograph in a manner that infringes Leong's copyright.

178.   AFP and Getty Defendants each knew or had reason to know of, and materially
contributed to The Arena Group's infringement described above, and thus are contributorily
liable for the resulting harm to Leong.

179.   AFP and Getty Defendants directly benefitted financially from The Arena
Group's infringement described above and had the right and ability to supervise and control such
infringement, and thus are vicariously liable for the resulting harm to Leong.

*The New York Times Company's Infringement*

180.    On December 7, 2018, Leong secured U.S. Copyright Registration No. VA 2-129-790, which covered the below photograph:



181.    On or about August 7, 2019, The New York Times Company and/or The Athletic Media Company accessed Getty Defendants' Platform, obtained a copy of the above Leong Photograph, and, on August 7, 2019, published an article in The Athletic entitled *Welbeck signs for Watford: How striker's move was a year in the making* that featured the above Leong Photograph with Leong's name excluded from the photo credit (as shown below):





182.    As of the date of this filing, The New York Times Company and/or The Athletic

Media Company are still publicly displaying the above Leong Photograph at the following URL:

https://theathletic.com/1121100/2019/08/07/welbeck-signs-for-watford-how-strikers-move-was-

a-year-in-the-making/.

183.    The New York Times Company and/or The Athletic Media Company have

continued to distribute, display, and commercially exploit this Leong Photograph in a manner

that infringes Leong's copyright.

184.    AFP and Getty Defendants each knew or had reason to know of, and materially

contributed to The Arena Group's infringement described above, and thus are contributorily

liable for the resulting harm to Leong.

185.    AFP and Getty Defendants directly benefitted financially from The Arena

Group's infringement described above and had the right and ability to supervise and control such

infringement, and thus are vicariously liable for the resulting harm to Leong.

186.    On September 9, 2019, Leong secured U.S. Copyright Registration No. VA 2-

172-983, which covered the below photograph:



187.    On or about May 14, 2019, The New York Times Company accessed Getty

Defendants' Platform, obtained a copy of the above Leong Photograph, and, on May 14, 2019,

published an article in The New York Times entitled *Eurovision Arrives in Tel Aviv, in Range of*

*Rockets and the Focus of Protests* that featured the above Leong Photograph (as shown below):



188.    As of the date of this filing, The New York Times Company is still publicly

displaying the above Leong Photograph at the following URL:

https://www.nytimes.com/2019/05/14/world/middleeast/eurovision-israel-tel-aviv.html.

189.    The New York Times Company has continued to distribute, publicly display, and

commercially exploit this Leong Photograph in a manner that infringes Leong's copyright.

190.    On January 3, 2019, Leong secured U.S. Copyright Registration No. VA 2-137-

594, which covered the below photograph:



191.    On or about October 10, 2019, The New York Times Company accessed Getty

Defendants' Platform, obtained a copy of the above Leong Photograph, and, on October 10,

2019, published an article entitled *Olga Tokarczuk and Peter Handke Awarded Nobel Prizes in*

*Literature* that featured the above Leong Photograph (as shown below):





192.     As of the date of this filing, The New York Times Company is still publicly

displaying the above Leong Photograph at the following URL:

https://www.nytimes.com/2019/10/10/books/nobel-literature.html.

193.     The New York Times Company has continued to distribute, display, and

commercially exploit this Leong Photograph in a manner that infringes Leong's copyright.

194.     AFP and Getty Defendants each knew or had reason to know of, and materially

contributed to The New York Times' infringement described above, and thus are contributorily

liable for the resulting harm to Leong.

195.     AFP and Getty Defendants directly benefitted financially from The New York

Times' infringement described above and had the right and ability to supervise and control such

infringement, and thus are vicariously liable for the resulting harm to Leong.

*Forbes Media LLC's Infringement*

196.     On February 12, 2019, Leong secured U.S. Copyright Registration No. VA 2-142-

577, which covered the below photograph:



197.     On or about March 29, 2020, Forbes Media LLC accessed Getty Defendants'

Platform, obtained a copy of the above Leong Photograph, and, on May 26, 2020, published a

Forbes article entitled *They Said THAT: Grace Slick, Buzz Aldrin, Ginger Baker, More* that featured the above Leong Photograph with Leong's name excluded from the unexpanded photo credit (as shown below):



198.    As of the date of this filing, Forbes Media LLC is still publicly displaying the above Leong Photograph at the following URL: https://www.forbes.com/sites/jimclash/2020/03/29/they-said-that-grace-slick-buzz-aldrin-ginger-baker-more/?sh=582173272baf.

199.    Forbes Media LLC has continued to distribute, publicly display, and commercially exploit this Leong Photograph in a manner that infringes Leong's copyright.

200.    AFP and Getty Defendants each knew or had reason to know of, and materially contributed to Forbes Media LLC's infringement described above, and thus are contributorily liable for the resulting harm to Leong.

201.    AFP and Getty Defendants directly benefitted financially from Forbes Media LLC's infringement described above and had the right and ability to supervise and control such infringement, and thus are vicariously liable for the resulting harm to Leong.

_BNA's Infringement_

202.     On January 15, 2019, Leong secured U.S. Copyright Registration No. VA 2-140-206, which covered the below photograph:



203.     On or about April 29, 2020, BNA accessed Getty Defendants' Platform, obtained a copy of the above Leong Photograph, and, on April 29, 2020, published a Bloomberg Law article entitled _INSIGHT: Seven Steps to Guard Against False Advertising Claims_ that featured the above Leong Photograph (as shown below):



204.    As of the date of this filing, BNA is still publicly displaying the above Leong

Photograph at the following URL: https://news.bloomberglaw.com/esg/insight-seven-steps-to-

guard-against-false-advertising-claims.

205.    BNA has continued to distribute, public display, and commercially exploit this

Leong Photograph in a manner that infringes Leong's copyright.

206.    AFP and Getty Defendants each knew or had reason to know of, and materially

contributed to BNA's infringement described above, and thus are contributorily liable for the

resulting harm to Leong.

207.    AFP and Getty Defendants directly benefitted financially from BNA's

infringement described above and had the right and ability to supervise and control such

infringement, and thus are vicariously liable for the resulting harm to Leong.

208.    On December 31, 2018, Leong secured U.S. Copyright Registration No. VA 2-

137-627, which covered the below photograph:



209.    On or about January 31, 2021, Bloomberg News accessed Getty Defendants'

Platform, obtained a copy of the above Leong Photograph, and, on January 31, 2021, published a

48

Bloomberg News article entitled *French Billionaire Puts Mozambique Leader at Heart of Debt Scam* that featured the above Leong Photograph (as shown below):



210.     As of the date of this filing, Bloomberg News is still publicly displaying the above Leong Photograph at the following URL:

https://www.bloomberg.com/news/articles/2021-01-31/french-billionaire-puts-mozambique-leader-at-heart-of-debt-scam#xj4y7vzkg.

211.     Bloomberg News has continued to distribute, publicly display, and commercially exploit this Leong Photograph in a manner that infringes Leong's copyright.

212.     AFP and Getty Defendants each knew or had reason to know of, and materially contributed to Bloomberg News' infringement described above, and thus are contributorily liable for the resulting harm to Leong.

213.     AFP and Getty Defendants directly benefitted financially from Bloomberg News'

infringement described above and had the right and ability to supervise and control such

infringement, and thus are vicariously liable for the resulting harm to Leong.

*Dotdash Meredith's Infringement*

214.     On January 5, 2019, Leong secured U.S. Copyright Registration No. VA 2-137-

592, which covered the below photograph:



215.     On or about May 29, 2019, Dotdash Meredith accessed Getty Defendants'

Platform, obtained a copy of the above Leong Photograph, and, on May 29, 2019, published a

People article entitled *11 Statues That Look Nothing Like Their Celebrity Counterparts* that

featured the above Leong Photograph (as shown below):



216.    As of the date of this filing, Dotdash Meredith is still publicly displaying the above Leong Photograph at the following URL: https://people.com/celebrity/bad-celeb-statues-photos/?slide=5679539#5679539.

217.    Dotdash Meredith has continued to distribute, publicly display, and commercially exploit this Leong Photograph in a manner that infringes Leong's copyright.

218.    AFP and Getty Defendants each knew or had reason to know of, and materially contributed to Dotdash Meredith's infringement described above, and thus are contributorily liable for the resulting harm to Leong.

219.    AFP and Getty Defendants directly benefitted financially from Dotdash Meredith's infringement described above and had the right and ability to supervise and control such infringement, and thus are vicariously liable for the resulting harm to Leong.

*Heavy, Inc.'s Infringement*

220.    On February 12, 2019, Leong secured U.S. Copyright Registration No. VA 2-142-577, which covered the below photograph:



221.    On or about February 13, 2020, Heavy, Inc. accessed Getty Defendants' Platform, obtained a copy of the above Leong Photograph, and, on February 13, 2020, published a Heavy.com article entitled *WATCH: Heroic Rescue of Big Wave Surfer Alex Botelho* that featured the above Leong Photograph (as shown below):



222.    As of the date of this filing, Heavy, Inc. is still publicly displaying the above Leong Photograph at the following URL: https://heavy.com/news/2020/02/alex-botelho-rescue/.

223.    Heavy, Inc. has continued to distribute, publicly display, and commercially exploit this Leong Photograph in a manner that infringes Leong's copyright.

224.    AFP and Getty Defendants each knew or had reason to know of, and materially contributed to Heavy, Inc.'s infringement described above, and thus are contributorily liable for the resulting harm to Leong.

225.    AFP and Getty Defendants directly benefitted financially from Heavy, Inc.'s infringement described above and had the right and ability to supervise and control such infringement, and thus are vicariously liable for the resulting harm to Leong.

*BuzzFeed's Infringement*

226.    On December 7, 2018, Leong secured U.S. Copyright Registration No. VA 2-129-790, which covered the below photograph:



227.    On or about March 14, 2019, BuzzFeed accessed Getty Defendants' Platform, obtained a copy of the above Leong Photograph, and, on March 14, 2019, published a BuzzFeed News article entitled *The Democratic Party's Chief Technology Officer Will Step Down* that featured the above Leong Photograph (as shown below):



228.    As of the date of this filing, BuzzFeed is still publicly displaying the above Leong

Photograph at the following URL: https://www.buzzfeednews.com/article/rubycramer/dnc-cto-

raffi-krikorian-leaving.

229.    BuzzFeed has continued to distribute, publicly display, and commercially exploit

this Leong Photograph in a manner that infringes Leong's copyright.

230.    AFP and Getty Defendants each knew or had reason to know of, and materially

contributed to BuzzFeed's infringement described above, and thus are contributorily liable for

the resulting harm to Leong.

231.    AFP and Getty Defendants directly benefitted financially from BuzzFeed's

infringement described above and had the right and ability to supervise and control such

infringement, and thus are vicariously liable for the resulting harm to Leong.

## CLAIM FOR RELIEF

### COUNT I
### Copyright Infringement of the 2022 Registered Works Under 17 U.S.C. §§ 101 *et seq.*
### (All Defendants)

232.    Leong repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

233.    Leong owns valid and subsisting copyright registrations in the Leong Photographs, namely, the 2022 Registered Works.

234.    Leong has not authorized Defendants or their partners, agents, licensees, affiliates, employees, contractors, customers, subscribers, or users to use, copy, publicly display, distribute, license, manipulate, or otherwise commercially exploit the Leong Photographs, namely, the 2022 Registered Works.

235.    Defendants have directly infringed Leong's copyrights in the Leong Photographs, namely, the 2022 Registered Works, by using, copying, publicly displaying, distributing, licensing, manipulating, or otherwise commercially exploiting the Leong Photographs, namely, the 2022 Registered Works, without Leong's authorization and with actual notice of Leong's copyright claims.

236.    Defendants' infringements of the 2022 Registered Works were willful and intentional.

237.    AFP and Getty Defendants intentionally and willfully infringed Leong's copyrights in the Leong Photographs, namely, the 2022 Registered Works, by continuing to distribute, hold out for licensing, publicly display, market, sell, and otherwise commercially exploit the Leong Photographs, namely, the 2022 Registered Works, after Leong terminated his

authorization to do so, and each of them did so with actual knowledge that such authorization was revoked, and with actual notice of Leong's copyright claims.

238.   AFP and Getty Defendants directly benefitted financially from each other's copyright infringement of the Leong Photographs, namely, the 2022 Registered Works, and had the right and ability to supervise and control each other's infringement of the Leong Photographs, namely, the 2022 Registered Works, as alleged above.

239.   AFP and Getty Defendants had actual knowledge of each other's infringement of the Leong Photographs, namely, the 2022 Registered Works, and each materially contributed to the other's infringement of the Leong Photographs, namely, the 2022 Registered Works, as alleged above.

240.   AFP and Getty Defendants each directly benefitted financially from the copyright infringement of the Leong Photographs, namely, the 2022 Registered Works, and had the right and ability to supervise and control the infringement of those to whom each of them marketed, licensed, sold, or otherwise facilitated the use of the Leong Photographs, namely, the 2022 Registered Works.

241.   AFP and Getty Defendants each directly benefitted financially from and had the right and ability to supervise and control its respective employees', agents, and contractors' infringement of Leong Photographs, namely, the 2022 Registered Works, as alleged above.

242.   AFP and Getty Defendants are each vicariously liable for their respective employees', contractors', and/or agents' infringement of the Leong Photographs, namely, the 2022 Registered Works, as described above.

243.     AFP and Getty Defendants each knew or had reason to know of their respective employees, contractors, and agents' infringement and intentionally induced and/or materially contributed to such infringement.

244.     AFP and Getty Defendants each knew or had reason to know of, and materially contributed to the infringement of those to whom each of them marketed, licensed, sold, or otherwise facilitated the use of the Leong Photographs, namely, the 2022 Registered Works.

245.     AFP and Getty Defendants are each contributorily liable for their respective employees', contractors', and agents' infringement.

246.     AFP and Getty Defendants are each secondarily liable for their respective employees, contractors, and agents' infringement.

247.     Leong has suffered actual harm and reputational harm, and incurred significant costs as a direct and proximate result of Defendants' direct and secondary infringement.

248.     Leong is entitled to recover damages based on his actual damages suffered as a result of Defendants' infringements of the 2022 Registered Works and the disgorgement of Defendants' profits attributable to the infringements of the 2022 Registered Works, pursuant to 17 U.S.C. § 504(b), which amounts will be proven at trial.

249.     Leong is entitled to his costs pursuant to 17 U.S.C. § 505.

250.     Defendants' conduct has caused, and any continued infringing conduct with respect to the 2022 Registered Works will continue to cause, irreparable injury to Leong, unless enjoined by this Court.  Leong has no adequate remedy at law.

251.     Pursuant to 17 U.S.C. § 502, Leong is entitled to a permanent injunction prohibiting infringement of Leong's exclusive copyrights in the Leong Photographs, namely, the 2022 Registered Works, by the Defendants and all persons acting in concert with the Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Leong requests that this Court enter judgment in his favor on each and every claim for relief set forth above and award him relief, including the following:

A. That an Order be entered against Defendants for violating the provisions of the Copyright Act, 17 U.S.C. §§ 101 *et seq*. by infringing Plaintiff's copyrights in the Leong Photographs, namely, the 2022 Registered Works;

B. That an Order be entered against Defendants in favor of Plaintiff for such damages as Plaintiff has sustained as a result of Defendant's infringement of the 2022 Registered Works;

C. That an Order be entered compelling Defendants to account for and/or disgorge all gains, profits, and advantages derived by Defendants by their infringement of Plaintiff's copyrights in the 2022 Registered Works or such damages supported by the provisions of the Copyright Act with respect to the 2022 Registered Works, 17 U.S.C. §§ 101 *et seq*.;

D. That an Order be entered granting injunctive relief against Defendants pursuant to 17 U.S.C. § 502 preventing and restraining infringement of Plaintiff's copyrights in the 2022 Registered Works by Ordering Defendants, their agents, or anyone working for, in concert with, or on their behalf not to use, publish, publicly display, distribute, hold out for licensing, commercialize, or in any way use or disseminate Plaintiff's copyrighted works, namely, the 2022 Registered Works;

E. That an Order be entered against Defendant AFP pursuant to 17 U.S.C. § 503 for the impounding and return to Plaintiff of all copies of the 2022 Registered Works in its

possession, including but not limited to the original, high-resolution image files for all 2022 Registered Works;

F.  That an Order be entered against Defendants pursuant to 17 U.S.C. § 503 for the impounding and/or destruction of all materials used in the violation of Plaintiff's exclusive copyrights in the 2022 Registered Works and any other articles by means of which such copies may be reproduced;

G.  That an Order be entered requiring Defendants to pay Plaintiff his costs in this action pursuant to 17 U.S.C. § 505;

H.  That an Order be entered requiring Defendants to pay Plaintiff punitive damages, as permitted by law, in an amount to be determined due to the foregoing willful acts;

I.  That Plaintiff be granted prejudgment and post-judgment interest as permitted by law; and

J.  Other relief as the Court may deem appropriate.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, Francisco Leong respectfully demands a trial by jury on all issues properly triable by a jury in this action.

Respectfully Submitted,

Dated: July 21, 2022
   New York, New York     PILLSBURY WINTHROP SHAW PITTMAN LLP

             By: */s/ Mark D. Litvack*
               Mark D. Litvack
               Samuel V. Eichner
               31 West 52nd Street
               New York, NY 10019-6131
               Tel.: (212) 858-1000
               Fax: (212) 858-1500

mark.litvack@pillsburylaw.com
sam.eichner@pillsburylaw.com

Jennifer G. Altman (*pro hac vice forthcoming*)
Shani Rivaux (*pro hac vice forthcoming*)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
Tel.:      (786) 913-4831
Fax:      (212) 999-6950
jennifer.altman@pillsburylaw.com
shani.rivaux@pillsburylaw.com

DUNCAN FIRM, P.A.
James H. Bartolomei III
809 W. 3rd Street
Little Rock, Arkansas 72201
Tel.:      (501) 228-7600
Fax:      (501) 228-0415
james@duncanfirm.com

HOBEN LAW
Bryan D. Hoben
1112 Main Street
Peekskill, New York 10566
Tel.:      (347) 855-4008
bryan@hobenlaw.com

*Counsel for Plaintiff Leong Francisco Paulo*